**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA**
**Plaintiff**

**vs. CR. 2007-005-S-LDA**

**EUDY TEJADA-PICHARDO**
**Aka Enoc Soto and**
**RICARDO MEJIA**

# DEFENDANT TEJADA'S POST-HEARING MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS STATEMENTS

Following a suppression hearing on July 5, 2007, this court granted the defendant's oral motion to brief issues relevant to whether the defendants' post-arrest statements should be suppressed. For the reasons set forth in this memorandum, this court should grant the motions filed on behalf of Eudy Tejada because (1) the undisputed evidence establishes that the arresting officers failed to obtain a waiver of Miranda rights from Mr. Tejada and his codefendant; and (2) Agent Naylor's deliberate choice not to advise Mr. Tejada that Marie Perez was cooperating with authorities, combined with the ruse of placing Ms. Perez in handcuffs and bringing her to the Providence police station, amounted to coercive and deceptive pressure. As a result, Mr. Tejada's statements were involuntary.

## FACTS

For purposes of the hearing, the facts in this case are essentially undisputed.[1] Mr. Tejada and Mr. Mejia were arrested outside of a MacDonald's restaurant on the evening of December 18, 2007. Prior to the arrest, law enforcement agents had monitored

[1] Neither defendant testified at the suppression hearing.

conversations between Mr. Tejada and an informant identified as “Jose.” The agents had also used the services of another informant—a “sub-informant”-- known as Marie Perez. According to agent Naylor, who was in charge of the investigation, Ms. Perez was working to assist her husband, who had been convicted of drug charges in the federal district court.[2]

Both Mr. Tejada and Mr. Mejia were arrested at gunpoint, and both informants were also taken into custody. According to Naylor, this was done to “protect” the informants, by misleading the defendants into believing that four individuals were being charged with a crime. Agent Naylor acknowledged that Ms. Perez was brought in handcuffs to the Providence police station along with Mr. Tejada and Mr. Mejia, while “Jose” was released at the DEA offices. Agent Naylor testified that he was quite certain that Mr. Tejada had seen Ms. Perez while she was in handcuffs at the police station, apparently in custody. Agent Naylor further testified that he understood that Ms. Perez was a “friend” of Mr. Tejada, and knew him through family acquaintances.

Agent Naylor testified that while he did not know whether Ms. Perez and Mr. Tejada were romantically involved. He said he had taken the precaution, however, of telling Ms. Perez not to become romantically involved with Mr. Tejada. Naylor also testified that he knew that Tejada had been arrested on an unrelated charge at some point in the past.[3]

---

[2] Per this court’s instruction, the name of the husband is not mentioned in this memorandum. However, he had been convicted of selling heroin after a trial and was awaiting sentencing in this court at the time of the arrest in this case.

[3] According to the probation report in this case, the charge was dismissed. The government has produced no evidence to suggest that the defendant has previously been given Miranda warnings, or has been interrogated by the police.

Detective Andre Perez, a native of Columbia with no training as an interpreter or translator, testified that he gave Miranda warnings to the defendants at the scene of their arrest, and provided them with a Spanish language form at the police station. Detective Perez testified that he read the form to each of the defendants separately while they were isolated in interrogation rooms, handcuffed to the wall. According to his testimony, the defendants signed and initialed the statements. The Spanish language Miranda forms do not contain any language indicating that the defendants wish to waive their constitutional rights, only that they "understand" the rights.

Detective Perez testified that interrogation began once the rights forms were signed. Agent Naylor testified that Mr. Tejada answered some questions in English, but frequently looked at Detective Perez when he did not understand a question. According to Agent Naylor, Mr. Tejada said he was only getting $500 to come to Rhode Island. Naylor testified that Tejada was "evasive," but that his demeanor changed when Naylor told him that "Jose" was an informant. Agent Naylor testified that Mr. Tejada stated Marie Perez had nothing to do with the drug transaction, and knew nothing about a gun seized from beneath the seat of a car in which Mr. Mejia was driving. Agent Naylor further testified that he knew that Mr. Tejada was giving a false statement when he indicated that Marie Perez was not involved in the crime.

During the hearing, Detective Perez was asked to read from Miranda forms in the Spanish language and to translate them. It appears that Detective Perez made a good faith effort to translate, but he struggled with some of the language. For example, he testified that one part of the form states that the defendant is "suspicious" rather than "suspected" of a crime. The form provided to Mr. Tejada and Mr. Mejia contained a

space to indicate the crime or crimes about which the police intend to ask questions. The space was left blank in both forms.

Mr. Tejada introduced the Spanish language form he signed and initialed under the name Enoc Soto. The initials on the form are unusual—Mr. Tejada alternately placed the letters "E" and "S" next to the enumerated sentences. Mr. Soto signed his name, but the space for his address contained the number "59." The government indicated that the number 59 match the numerals at the beginning of Mr. Tejada's home address in Massachusetts. Detective Perez testified that he did not question Mr. Tejada about the number, nor did he inquire as to why Mr. Tejada did not complete the address form. There is no evidence that anyone questioned Mr. Tejada about the unusual manner in which he completed the form. Perez admitted that he did not inquire as to the defendants' educational background.

**THE POLICE INTERROGATED MR. TEJADA WITHOUT OBTAINING A VALID WAIVER OF HIS RIGHTS**

In criminal trials, the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards that secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Miranda remains the law of the land, and assures that all defendants are protected from police overreaching. See Dickerson v. United States, 530 U.S. 428 (2000). The prosecution is required to show that the defendant received Miranda warnings before custodial interrogation began, that he had the opportunity to exercise the rights throughout the interrogation, and that he knowingly and intelligently waived those rights and agreed to answer questions or make

a statement. Id., at 479; United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000). The district court must begin with the ***presumption that the defendant did not waive his rights***. Palmer, 203 F.3d at 60 (emphasis added). Establishing waiver is viewed by the Supreme Court as a "heavy burden." Miranda, 384 U.S. at 475.

The Miranda decision was predicated upon the conclusion that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not do so otherwise freely." Miranda, 384 U.S. at 467. The government bears the burden of proving a valid waiver by a preponderance of the evidence. See id.; United States v. Rosario-Diaz, 202 F.3d 54, 69 (1st Cir. 2000). This requirement exists in a world where the Supreme Court has long recognized that the modern practice of police interrogation is more psychologically than physically oriented, that coercion is mental as well as physical, and "that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Miranda, 384 U.S. at 448, citing Chambers v. Florida, 309 U.S. 227 (1940) and Blackburn v. Alabama, 361 U.S. 199, 206 (1960).

It is not enough to simply ask a defendant whether he "understands his rights." Merely asking whether an accused whether he understands his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. "Miranda requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them." United States v. Porter, 764 F.2d 1, 5 (1st Cir. 1985); United States v. Christian, 571 F.2d 64 (1st Cir. 1975). Both Porter and Christian follow the Miranda teaching that "a valid waiver will not be

presumed simply from the silence of the accused after warnings are given ***or simply from the fact that a confession was in fact eventually obtained***." Miranda, 384 U.S. at 475 (emphasis added).

In Porter a defendant in custody contacted his attorney without the knowledge of a supervising DEA agent. The agent then administered Miranda warnings to the defendant, and the defendant indicated that he understood the warnings. Under questioning, the defendant then made inculpatory statements. The First Circuit held that the statements were inadmissible, despite Porter's acknowledgment that he understood the warnings.

The government claimed at the July 5 suppression hearing that the Porter holding was "inapposite" because the defendant had already invoked his right to counsel. While the government is correct that the Porter opinion noted the defendant's invocation of his right to counsel by calling an attorney before he received Miranda warnings, the holding relied on Miranda, and plainly noted that asking the defendant whether he understood his rights is insufficient to constitute waiver.

In Christian, FBI agents gave an arrested defendant a two part FBI form. The top part set forth Miranda rights, and the bottom part set forth a waiver of the rights. The defendant signed below the statement of rights, but did not sign in the space indicating that he waived his rights. The district court permitted the statements at trial. The First Circuit reversed the defendant's conviction, relying on Miranda, and held that merely giving the warnings to the accused was insufficient to make his statements admissible.

The court cannot infer a waiver from the defendant's silence. Here, the only person to administer Miranda warnings was Detective Perez. Perez's testimony was that

he administered warnings at the scene of arrest and read warnings from a printed form at the station. The form does not contain a clause indicating that the defendant, having understood the rights, chooses to waive them. Detective Perez never asked the defendants if they wished to give up their rights. He did not ask if they would agree to answer questions. Instead the interrogation proceeded without any attempt to confirm that the defendants were choosing to give up their Fifth Amendment privilege. This is not a situation where the government can point to other factors that support some sort of implied waiver. Detective Perez was clear—once the defendants signed the forms, the questions commenced.

In determining whether the government has met its heavy burden, this court should consider that Detective Perez is not a trained interpreter or translator. This factor weighs against the government. There is no doubt that Detective Perez speaks the Spanish language as a result of his family history. Still, he struggled while reading and translating the Spanish language forms shown to him during the Suppression hearing. This also weighs against the government.

Mr. Tejada completed the form in an unusual way, alternately placing a single initial next to each enumerated right.[4] He did not complete the address section. The government will undoubtedly argue that by writing the number "59," the court may infer that Mr. Tejada appeared to understand what he was doing. A more plausible inference is that Mr. Tejada was not given sufficient time to complete the form. In any event, neither Detective Perez nor Agent Naylor made any attempt to clarify whether the defendants were voluntarily surrendering their Fifth Amendment privilege.

---

[4] On cross-examination, Agent Naylor attempted to explain this by suggesting that he suspected that Mr. Tejada was using an assumed or false name. How this changes Mr. Tejada's rather strange way of initialing the form is a mystery.

The failure of the police to secure a valid constitutional waiver is no mere "foot fault." Miranda was intended as a prophylactic rule, one designed to assure that all defendants facing custodial interrogation are able to make a free decision to surrender their constitutional privilege. The touchstone is not simply "understanding" the warnings, but choosing to give up the rights. While the form provided by Detective Perez tended to show that the defendants were given their warnings, he did not go far enough. It is clear that other forms, such as the form shown to Detective Perez from the Central Falls police, do contain affirmative waiver language in them. Had the police used that sort of form in this case, Mr. Tejada's argument would be weakened. But here there is no waiver language, and there was no attempt to secure an oral affirmative waiver from the defendants. In the absence of a specific showing by the government that the defendants then agreed to answer questions, the requirements of Miranda have not been satisfied.

**MR. TEJADA'S STATEMENTS<br>WERE THE PRODUCT OF UNFAIRLY COERCIVE DECEPTION AND<br>WERE THEREFORE INVOLUNTARY**

The Supreme Court has held that confessions procured by coercive official tactics must be excluded as involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986), United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998), United States v. Santos, 131 F.3d 16, 19 (1997). While the police are permitted to use some level of trickery in obtaining statements from suspects, courts recognize that certain police tactics amount to coercion, such as where the police falsely claim that they will take a suspect's child away. Lynum v. Illinois, 372 U.S. 528, 534 (1963). See also United States v. Rogers,

906 F.2d 189, 192 (5th Cir. 1990) (statements suppressed where police tell defendant that if he cooperates with them he will not be charged.); United States v. Beale, 921 F.2d 1412 (11th Cir. 1991) (statements inadmissible despite signed Miranda waiver where defendant is told by police that his statements will not hurt him).

In this case, Agent Naylor conceded that the officers involved in this case engaged in a ruse designed to convince the defendants that all of the individuals at the scene of the crime were being arrested. Ms. Perez was stopped at gunpoint, handcuffed, and taken into custody with Mr. Tejada. Agent Naylor had no doubt that Mr. Tejada could see his friend being escorted inside the police station. At no time did Naylor ever disclose to Mr. Tejada that Ms. Perez had nothing to fear from the police, and in fact was cooperating with them. Agent Naylor says this was done to protect Ms. Perez. Regardless of his intentions, he continued the ruse while questioning Mr. Tejada in an unrecorded interview. Naylor testified that Mr. Tejada said that Ms. Perez was innocent and had nothing to do with the delivery of drugs to Rhode Island—a fact that Naylor knew was not true. Based solely on Naylor's testimony, it is reasonable to assume that Mr. Tejada was attempting to protect Ms. Perez from the police.

The elaborate ruse of arresting Ms. Perez and then presenting her in custody was improper and amounts to coercive conduct on the part of the police. The police manipulated the circumstances to suggest that a woman Mr. Tejada cared about was at risk. The result was that Tejada—a man whose primary language was Spanish-- made statements that incriminated himself and exculpated Ms. Perez. He did this while chained to a wall, in a small room[5] with two police officers, after guns had been pointed at him when he was placed under arrest. Tejada's alleged statement that Marie Perez was

[5] Detective Perez testified that the room was approximately eight feet by eight feet.

not involved in the crime was known by the police to be false. Yet the government hopes to use the statement against Mr. Tejada.

The totality of the circumstances here shows that the government has not met its burden of showing that Mr. Tejada's statements were a "product of a free and deliberate choice, rather than intimidation, coercion and deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). This court should find that Mr. Tejada's statements were involuntary. The police may wish to safeguard the privacy of informants. But they also wish to gain convictions. What happened may have been done to protect Ms. Perez. But what Mr. Tejada allegedly said also appears to have been designed to protect Ms. Perez, and the statement was secured by Agent Naylor's deceit. This court should not permit the government to use this sort of deception about informants to induce confessions.

**CONCLUSION**

Accordingly, the statements made at the police station should be suppressed. Mr. Tejada's statement was given involuntarily, and the government should be precluded from using it in any manner at trial.

/s/ Thomas G. Briody
R.I. Bar no. 4427
The Remington Building
91 Friendship Street
Third Floor
Providence, RI 02903
(401) 751-5151
(401) 421-0876 (facsimile)
Tbriodylaw@aol.com

The undersigned certifies that this motion was filed electronically and distributed to all parties, including AFD Mary McElroy and AUSA Sandra Beckner via the ECF system on July 12, 2007.

/s/Thomas G. Briody