**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA**

**vs.** **CR No. 07-005S**

**EUDY ANTONIO TEJADA PICHARDO**
**and**
**RICARDO MEJIA**

# MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE PERTAINING TO LISA TORRES, JOHN CICILLINE, AND THE SUBINFORMANT AND REQUEST FOR EVIDENTIARY HEARING

Now comes the defendant, by and through counsel, and moves for the production of evidence concerning the female subinformant and the government's conduct in connection with said subinformant. The defendant further asks for an evidentiary hearing, and requests that the government produce the following individuals to give testimony:

A. The female subinformant; and

B. Task Force Agent Michael Naylor;

Defendant further requests production of any exculpatory material known to the government or reasonably available to it through the exercise of due diligence; these materials would include, but are not necessarily limited to:

(1) All records maintained by DEA Task Force Agent Michael Naylor or by the DEA concerning his contact with John Cicilline and/or Lisa Torres, in connection with the cooperation by the female subinformant on behalf of her husband,

including dates of all meetings, all written agreements, notes, reports, emails, voicemails, or any other recordings;

(2) All reports, emails, voicemails, notes or documents made by TFA Naylor in connection with his August 27, 2007 telephone conversation with the female subinformant;

(3) All reports, notes, “302s”, documents, emails in the custody of the United States Attorney for the Districts of Rhode Island and Massachusetts that pertain to an investigation of Lisa Torres, John Cicilline and/or the female subinformant, including witness statements made by the female subinformant concerning her relationship with Lisa Torres and/or John Cicilline; this request is intended to include, but is not limited to materials generated in connection with the female subinformant’s interview with an FBI agent identified as “Kimberly” who sought to interview the female subinformant on or about August 27, 2007.

(4) All reports, emails, voicemails, notes, receipts or documents made by TFA Naylor in connection with his January 20, 2007 meeting with the female subinformant;

(5) All documents, notes, reports, emails, voicemails, or any other materials, including any signed agreement, reflecting that Lisa Torres was registered as an informant for the DEA or any other law enforcement agency within the Districts of Rhode Island, Massachusetts or elsewhere in the years 2003, 2004, 2005, 2006 and 2007;

(6) All documents, notes, reports, emails, voicemails, or materials that pertain to reviews of Lisa Torres’ status and performance as an informant (as described in

paragraph 5, above), including whether she was deactivated or reactivated, and the specific reasons for said deactivation or reactivation, in the years 2003, 2004, 2005, 2006, and 2007;

(7) All emails, notes, reports, correspondence or documents of any kind reflecting efforts by AUSA Sandra Beckner or any prosecutor of the United States Attorney's Office for the District of Rhode Island to obtain a dismissal/reduction of charges lodged against the female subinformant's husband in New York or in any other jurisdiction;

(8) All phone numbers for the female subinformant and Lisa Torres, or any other information that documents telephonic contact between Lisa Torres and the female subinformant; and

(9) Any other information which might reasonably be characterized as evidence favorable to Mr. Tejada on the issues of guilt or punishment.

The defendant relies upon Kyles v. Whitley, 514 U.S. 419 (1995), Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972) Pennsylvania v. Ritchie, 480 U.S. 39 (1987) and Dennis v. United States, 384 U.S. 855 (1966). Mr. Tejada specifically requests that the court direct the government to produce documents, and not permit the government to rely on oral submissions from its prosecutor.

The further defendant relies on the accompanying memorandum in support of this motion.

/s/ Thomas G. Briody
R.I. Bar no. 4427
The Remington Building
91 Friendship Street
Third Floor
Providence, RI 02903
(401) 751-5151
(401) 421-0876 (fascimile)
Tbriodylaw@aol.com

The undersigned certifies that a true copy of this motion was filed electronically and distributed to all parties on this 4th day of October, 2007.

/s/Thomas G. Briody

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA**

**vs.** **CR No. 07-005S**

**EUDY ANTONIO TEJADA PICHARDO**
**and**
**RICARDO MEJIA**

**MEMORANDUM IN SUPPORT OF MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE PERTAINING TO LISA TORRES, JOHN CICILLINE, AND THE SUBINFORMANT**

**Introduction.**

On its face, this motion is a simple one: the defendant is seeking information pertaining to the female subinformant and her contact with her husband's lawyer and his "paralegal." The reality is far more complex. The lawyer and "paralegal" are alleged to have corrupted the federal criminal justice system, and now stand indicted for obstructing justice. The "paralegal," upon information and belief, was a registered informant of the DEA in Rhode Island. The "paralegal" introduced the female subinformant to the DEA, and apparently to the case agent in the matter captioned above.

The connection between the female subinformant and these other individuals has been known, or reasonably should have been known, by the prosecutor since before Eudy Tejada was arrested. The prosecutor did not disclose this information to Mr. Tejada despite numerous Brady motions seeking information about the subinformant's

background and about the potential benefits to the subinformant and her husband, a convicted heroin trafficker.

The prosecutor denies that the information sought by Mr. Tejada is Brady material. The defendant disagrees. The facts and travel of this case suggest that the prosecutor made a calculated decision that this material is not exculpatory. For that reason, the defendant moves this court to review its previous Brady rulings, and to order production of documents and information about how the female subinformant came to serve as a cooperator. The defendant also moves for the government to detail all of its efforts to obtain benefits for the female subinformant and her husband here in Rhode Island and in New York. In order to place this matter in a proper context, Mr. Tejada sets forth the history and travel of this case.

**Facts and Travel.**

The defendant in this matter was arrested on December 18, 2006. His arrest followed an investigation in which the female "subinformant" worked with DEA Task Force Agent Michael Naylor. Prior to Mr. Tejada's arrest, the female subinformant appeared to live in or near Lawrence, Massachusetts. She worked in a restaurant near Lowell, Massachusetts. She had telephone contact with authorities in Rhode Island, but does not appear to have been under surveillance. According to Task Force Agent Naylor, the female subinformant was "activated" and "utilized" by the DEA, but the DEA does not supervise its informants.[1]

---

[1] At a suppression hearing, Agent Naylor described his relationship with the female subinformant as follows:

"We're her handlers. You know, we did the activating of it. ***We don't supervise them. We activate the informant and then utilize them***, sir." Tr., July 5, 2007, pp. 43-44 (emphasis added).

While this may be a question of semantics, the female subinformant's contact with Mr. Tejada does not appear to have been closely monitored by the DEA. Her contact with other individuals, including other informants, does not appear to have been monitored. The female subinformant was not searched prior to coming to Rhode Island from Massachusetts. In situations where informants are used to locate drugs and arrest traffickers, surveillance is standard procedure. The government commonly suggests that this is for security. Another reason is that informants are not trustworthy, and authorities need to assure that drugs are not planted or supplied by the informant.

Following Mr. Tejada's arrest, the female subinformant's identity was protected by Agent Naylor and by prosecutors. In his DEA report, Naylor noted that calls were made to Mr. Tejada "through (the subinformant)." He also noted that agents "observed (the subinformant) arrive in a red Chevrolet" at the scene of the alleged drug delivery. The female subinformant was alone in the car.

Mr. Tejada arrived at the scene in another car, a green Toyota Camry registered under the name "Enoc Soto." According to another DEA Task Force agent, Joseph Colanduano, Mr. Tejada retrieved a suitcase of suspected cocaine from the red Chevrolet—the car driven by the female subinformant. See Providence Police Incident Report Summary, dated 12/18/06 ("Soto (Tejada) then went to the passenger side of the red Chevrolet and retrieved a large black suitcase…"). Despite these facts, the DEA agents did not identify the female subinformant as a cooperator. Instead, Naylor wrote that she was "released after being interviewed regarding the arrest." Agent Naylor later admitted under oath that he deliberately wrote his report to hide the fact that the subinformant was cooperating with authorities. See Transcript, Suppression Hearing,

July 5, 2007, pp. 52-53. Mr. Tejada was indicted by a federal grand jury in Rhode Island on January 10, 2007. He was arraigned before Magistrate Judge Almond on January 12, and a standard pre-trial order was entered. In that order, the government was directed to produce Brady and Giglio information to the defendant.

Five days earlier, a federal grand jury in Massachusetts had indicted attorney John M. Cicilline and his "paralegal/interpreter," a woman named Lisa Torres, on charges of obstructing justice and making false statements to a federal prosecutor. This matter was widely publicized in Rhode Island. At the time of the Cicilline/Torres indictment, the Assistant United States Attorney (AUSA) in charge of the instant case, as well as TFA Naylor, knew that Cicilline represented the "family member" of the female subinformant. The AUSA had prosecuted the family member, and obtained a guilty verdict following a jury trial; TFA Naylor served as the case agent in the family member's trial. The government has recently confirmed that the "family member" is in fact the subinformant's husband.

In addition to serving as a "paralegal" for John M. Cicilline, Lisa Torres was also an informant registered with the DEA. She is described in her indictment as a "third party cooperator" who acts on behalf of Mr. Cicilline's clients, to assure that they receive credit for information she supplies. See Indictment, United States v. Cicilline, et al., paragraphs n, o, pp. 12-13, January 4, 2007. Upon information and belief, Torres has been activated and later deactivated as an informant for alleged "unethical behavior." The precise nature of this unethical behavior is known to the government, but is unknown to the defendant. Also upon information and belief, the government is aware that Lisa Torres has advised potential clients of ways in which they can reduce punishment for

drug offenses by assisting the authorities in identifying other drug traffickers. Ms. Torres has, upon information and belief, urged clients and their families to plant drugs in cars and then "tip" the authorities in order to make arrests.

On January 20, 2007, several weeks before Mr. Tejada was made aware that the female subinformant was cooperating with the DEA, TFA Naylor met with the female subinformant and paid her $2500 in cash. Naylor recorded the conversation, apparently without the subinformant's knowledge. During the conversation, which lasted several minutes, Naylor and the subinformant discussed the following:

(1) Naylor's concern about the female subinformant's relationship with Lisa Torres, who he describes as the subinformant's "friend";

(2) Naylor's belief that John M. Cicilline was the lawyer for the female subinformant and for her husband, and noting that Cicilline was very pleased with her work as a cooperator; and

(3) that the AUSA was attempting to dismiss pending criminal charges against the subinformant's husband in the state of New York ("***I told your lawyer, John, the same thing, what we did. So, so she's gonna try to remove… the New York charge. If they don't give anything, she's gonna give what's called a 5K down here***.").[2]

TFA Naylor tells the female subinformant (identified below as "FSI" that he wants to confirm that her information concerning Mr. Tejada (aka Enoc Soto) is not related to Lisa Torres:

[2] The recording strongly suggests that the female informant believed that her husband would be released from prison based on her cooperation. Agent Naylor tells the informant that he will instead receive a reduced sentence, and that he has no control over what the prosecutor does.

Naylor—Right. So, that's it, and I just want to go… ***as far as Lisa, she's your friend, now, is she your friend, yes or no? To a degree, right?*** She had nothing to do with Enoc Soto.

FSI—No.

Naylor—Nothing to do with the two arrests, the two arrests of Enoc and his friend…

FSI—Oh no, no…

Naylor—Okay.

FSI—She doesn't know…

Naylor—She doesn't know those people, I understand, but these are things I want to get clear… now she's in trouble up there…

FSI—I know.

Naylor—Okay. And that has nothing to do, and that's (UI) almost similar thing… like, she's getting paid to introduce people around… and I don't wanna mix up your case and her case…

FSI—I never gave her anything…

Naylor—Okay, good. I understand that. I want to make sure that you said that 'cause you told me that originally… and I think the first day that I talked to you… and I've talked to you three times, and I just wanna make sure, so we're not worried about that. Okay? These are things I want to make clear with you. And, if she tells you, asks you to do something criminal, you're going to tell me.

FSI—Of course.

Naylor—Okay? Trust me on her, I—don't, you know what I mean, like I told you, she is… she is… you know, does her own thing. So don't get involved with that. ***You might be her friend and go look for apartments with her, but—don't get involved criminally in anything she does***.

Transcript—Recording dated January 20, 2007 (emphasis added).[3]

---

[3] Defendant's transcriptions of these recordings have been filed simultaneously under seal, with a copy delivered to the government.

In February, 2007, the defendants in this case inquired as to whether the woman arrested with Mr. Tejada and Mr. Mejia was cooperating with authorities. The government initially ignored or refused to acknowledge these requests. On March 8, the defendants filed a Joint Motion for Disclosure of the Identity of Informant or Informants. On March 13, in a chambers conference, the prosecutor confirmed that the female arrested with Mr. Tejada was in fact an informant (subinformant). On March 14, the prosecutor wrote to defense counsel and indicated that the female subinformant had received $2500 to allow her to relocate "when her identity as an informant became known." The government refused to provide any personal information about the subinformant, and did not disclose her relationship to the "family member" she was assisting.

On March 16, 2007 Mr. Tejada filed a Joint Motion for Exculpatory Evidence (Doc. 34). Among other requests, Mr. Tejada sought information about the nature of the family relationship between the subinformant and her family member (para. 15), the caption and docket number of the case in which the family member was prosecuted (para. 16), and "[a]ny other material which might reasonably tend to undermine the credibility of the informant or the sub-informant."(para. 18). The government's Response (Doc. 35) stated that the government had "fully satisfied its discovery and Brady obligations." The government objected to the disclosure of evidence sought in paragraphs 15 and 16, stating that the information was "not exculpatory" and that the request could "seriously jeopardize the safety of the individual in question." The government made no response to the request made in paragraph 18.

On August 10, 2007 counsel for Mr. Mejia filed a motion for Production of Exculpatory Evidence Pertaining to New York Impeachment Material Involving Informants (Doc. 95). In that motion, the defendants sought information pertaining to United States v. De La Rosa, a pending case in the Western District of New York. The female subinformant's husband was named as a defendant in the De La Rosa matter. The defendants noted their concern that the subinformant's family member might be receiving a promise, reward or inducement. The government's Response (Doc. 101) states that "the second informant and his or her family member has not received any benefit for cooperation provided by the second informant." The government made no mention of any effort to obtain reduced charges or a dismissal of charges in New York. Upon information and belief, the New York case is pending, but no action has been taken with regard to the female subinformant's husband. The whereabouts of the husband are unknown to Mr. Tejada or his counsel, and it is unclear whether he is in custody.[4]

On August 27, TFA Naylor received a telephone call from the female subinformant. At some point after they began speaking, Naylor began to record the conversation, again apparently without the knowledge of the subinformant. The subinformant indicated that she had been contacted by a woman named "Kimberly." "Kimberly" was apparently an FBI agent seeking information about Lisa Torres.

> Naylor—So, who wants to meet you?
>
> FSI—Uh—Kimberly. (UI) don't know, she's going to have some questions about how I met Lisa, and, what do I know about Lisa. So…

---

[4] According to the Bureau of Prisons Inmate Locator website, the subinformant's husband is not presently in the custody of the Bureau of Prisons, despite his having received a lengthy term of imprisonment here in the District of Rhode Island in March, 2007.

Naylor—Okay. Well, you've got to tell the whole truth, if you're going to go talk to her you're going to tell her the whole truth…

FSI-- Oh, well, of course, but I, you know, I'm calling, to let you know..

Naylor—Yeah. Is Lisa in jail?

FSI—I don't know. I don't know. ***I told you to find out for me***. Because I'm…

Naylor—Yeah.

FSI—Because they told "Palino" that she was in jail.

Naylor—Really, because I thought she was out on bail, but I don't know anything about that case, really… so, I, I don't understand it… so when she took the ten thousand dollars, right, originally[.]

**Transcript, August 27, 2007 Recording (emphasis added)**.

The female subinformant also asks how she should answer questions from the FBI, and reminds Agent Naylor how she (the female subinformant) was introduced to the DEA:

FSI—So, uh, what about, if they ask me any questions about Johnny?

Naylor—Well, uh, what about Johnny? (Chuckles) You know, he's your husband's lawyer, is he your lawyer?

(slight pause)

FSI—No.

Naylor—All right then. If he's your lawyer, if he, I don't know the rules on that. So I shouldn't even say anything. I shouldn't even—I'm not going to advise you either way. But I mean, if they ask you—did you ever do anything wrong with Johnny?

(slight pause)

FSI— No.

Naylor—All right, then you've got nothing to worry about. Right?

FSI— No.

Naylor—You know what I mean, so if you have, if you had something to worry about then you'd – if you think she did something wrong… then you're going to need to, probably get a lawyer. If you didn't do anything wrong don't get a lawyer and just tell them the truth.

FSI—No, I (UI) I don't need to get a lawyer, haven't done anything wrong. I was just…

Naylor—Right.

FSI—I was involved in this—all this—situation… you know how.

Naylor—Right, no…

FSI—Because I really—you know…

Naylor—No, I understand that, I understand that, that's why I said, when I first met you I said no contact, I want nothing to do with Lisa, y'now what I mean, I knew you…

FSI—***Remember I met you through Lisa, I met you through her***!

Naylor—***I remember that***.

**Transcript, August 27, 2007 recording (emphasis added)**.

As the recording concludes, Agent Naylor and the subinformant agree to speak later in the day after Naylor tries "to find out what's going on."

This court convened a motions hearing on August 29, 2007 and addressed the request for supplemental Brady material. Agent Naylor attended the hearing. No mention was made of the conversations between Agent Naylor and the female subinformant. The prosecutor confirmed her earlier written statement that the female subinformant's husband had received no benefit in connection with charges pending in New York.

Mr. Tejada commenced trial preparations, and filed a motion to sever. In order to obtain the severance, Mr. Tejada set forth a theory of defense, based on the evidence then made available to the defendants. The court conducted a calendar call on September 18, and met with the parties for a chambers conference at 9:40 a.m. Moments before the conference, the prosecutor handed defense counsel two CDs, which she characterized as Jencks material, containing statements of the female subinformant. The prosecutor suggested that the tapes were inconsequential, and should not have any effect on plans to proceed to trial. The prosecutor reiterated these statements before the court. The two CDs in question contain Agent Naylor's conversations with the female subinformant on January 20, 2007 and August 27, 2007. For the first time, defense counsel learned that Lisa Torres was involved in arrangements for the female subinformant to cooperate.

## ARGUMENT

### The Female Subinformant's Relationship With Lisa Torres is Exculpatory.

The prosecutor characterizes the recordings as Jencks material. This view of this evidence is, quite simply, astonishing. The CD recordings are clearly Brady material for the following reasons: The female subinformant is the "friend" of an infamous informant who is presently under indictment for encouraging people to lie to federal agents and to a federal prosecutor, in order to obtain reduced sentences in federal court. This same informant also served as a "paralegal" to a lawyer who allegedly conspired with her to lie to federal authorities. This same lawyer represents the subinformant's husband. The "paralegal" introduced the female subinformant to the DEA agent assigned to investigate and prosecute Mr. Tejada.

On January 20, 2007 Agent Naylor met with the female subinformant and secretly recorded the conversation. Agent Naylor brought up the name "Lisa," and stated that he knew that the two women are friends. He acknowledged that the two women will see each other again, perhaps to look for an apartment, but he warned the subinformant not to do anything "criminal."

Eight months later, the female subinformant called Agent Naylor seeking his help in finding out about an FBI investigator seeking information about Lisa Torres. The subinformant reminded the agent that Lisa Torres introduced the subinformant to the DEA. The conversation caused enough concern to Agent Naylor that he began to record the conversation without the subinformant's knowledge. During the conversation, the female subinformant seeks Agent Naylor's advice about "what to tell" the FBI. While Naylor advises the female subinformant to "tell the truth," it is reasonable to infer that the female subinformant possesses information about "Johnny." Rather than inquire as to what that information is, Agent Naylor asks simply whether the informant has "done something wrong." Agent Naylor later assures the female subinformant that they will speak again after Naylor attempts to "find out what's going on." These facts raise significant questions about Agent Naylor's knowledge, as well as the female subinformant. It is also highly inappropriate for a federal agent to brief an informant about a criminal investigation. See Attorney General's Guidelines on Confidential Informants, Sec. I, F. 1 ("A JLEA [Joint Law Enforcement Agency, e.g., DEA] Agent must ***take the utmost care to avoid conveying any confidential information*** to a CI other than what is necessary and appropriate for operational reasons.").

While the government undoubtedly wishes that Ms. Torres's actions had no impact on the female subinformant, it is clear that Ms. Torres in fact had substantial contact with her. The government clearly possesses information about their relationship. That information must be disclosed and evaluated by Mr. Tejada.

Ms. Torres is presently under indictment in a conspiracy where she allegedly lied to federal authorities and encouraged a female defendant to lie to federal authorities, all in an effort to obtain reduced sentences in federal prosecutions. <u>See</u> Indictment, <u>United States v. Bevilacqua and Cicilline, et al.</u>, Cr. No. 1-07-10008, (D.Mass.). The case agent in this matter has characterized Ms. Torres as devious and shady. <u>See</u> Transcript, August 27, 2007 ("So… I… ***anything to do with her is shady***. So, I mean, it's just, uh, makes you nervous, anytime you talk about her, she's got too many angles, you know, she could have been taking that money for legal fees, or she could have been taking it to, steal it, because, ***you know, she's, she's that devious***." The precise nature of Ms. Torres' relationship with the DEA is presently unclear, but she was on sufficiently good terms with the DEA's Rhode Island office that she was able to introduce the female subinformant to DEA agents—and specifically to TFA Naylor-- at some point late last year.

Any information known or reasonably available to the prosecutor regarding Ms. Torres and her contact with the female subinformant is potentially exculpatory. The defendant is entitled to explore defense theories that involve Ms. Torres and her contact with the female subinformant. To that end, Mr. Tejada should be permitted to review all information known to the government about Ms. Torres' background, including her history as an informant, and the reasons she was activated or deactivated. Since it

appears that the female subinformant was questioned by an FBI agent about her association with Ms. Torres, that information should also be disclosed.

It is clear from the context of both recordings made by Agent Naylor that he was concerned about the female subinformant's contact with Lisa Torres. If Naylor generated any documents or materials other than the recordings themselves, they should also be disclosed. Mr. Tejada is entitled to know what efforts were made by Naylor to confirm the female subinformant's claim that her information concerning Mr. "Soto" had nothing to do with Lisa Torres. To that end, Mr. Tejada asks that this court convene and evidentiary hearing and compel the testimony of the female subinformant and Agent Naylor to explore the following:

1. The history of how the female subinformant was introduced to the DEA;
2. The reason Agent Naylor chose to record his conversation with the female subinformant on January 20, 2007;
3. Whether Agent Naylor attempted any other investigation of the relationship between the female subinformant and Lisa Torres, either before or after January 20, 2007;
4. Whether the government has made or is aware of any other recordings of the female subinformant that pertain to her relationship with Lisa Torres;
5. Whether any reports, notes or other materials exist that pertain to the female subinformant's relationship to Lisa Torres;
6. The reason Agent Naylor chose to begin recording his conversation with the female subinformant on August 27, 2007; and

7. Whether Agent Naylor or any other law enforcement agent, including the FBI, made any notes or recordings that pertain to the subinformant's relationship with Lisa Torres.

**Efforts To Dismiss Charges Against The Subinformant's Husband Are Exculpatory And Must Be Produced.**

The prosecutor in this matter has indicated that "no benefit" has been received by the female subinformant or her husband in connection with pending charges in New York. On January 20, 2007, Agent Naylor indicates that the prosecutor attempted to obtain dismissal of these charges. Mr. Tejada's Brady motion sought information concerning promises, rewards and inducements. Mr. Tejada asks this court to inquire directly of the government

1. Whether any attempt was made to obtain reduced or dismissed charges;
2. The prosecutor's knowledge of the status of <u>United States v. De La Rosa</u>;
3. Whether the subinformant's husband is charged in any other federal indictment;
4. Whether the subinformant's husband is in custody; and
5. Whether the prosecutor in New York has been advised of the female subinformant's continuing cooperation;
6. Whether any reports, correspondence, email or voicemail exists that pertains to efforts to obtain dismissal of charges in New York.

Defendant, based on the evidence produced, has indicated his intention to argue that he was entrapped. In an entrapment case, improper inducement is a central issue for the jury to consider. See United States v. Acosta, 67 F.3d 334 (1st Cir. 1995)(discussing inducement and predisposition) and United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994)(setting forth parenthetical examples of improper inducement). The motivations of the female subinformant are relevant to the question of improper inducement. As in any criminal case where informants may appear as witnesses, motivation is relevant to the credibility of the informant. See e.g., United States v. Perkins, 926 F.2d 1271 (1st Cir. 1991), United States v. Tracey, 675 F.2d 433, 437 (1st Cir. 1982), citing Davis v. Alaska, 415 U.S. 308, 315-316 (1974). The defendant seeks information concerning any agreement or negotiations between the government and counsel for the subinformant's husband. If any of this information was reduced to writing, the defendant should be permitted to review it.

Entrapment, however, may not be the only defense available to Mr. Tejada. The government cannot pick and choose the information it provides to the defense. The defendant should be allowed to explore any viable defense in this case. To do that, the government should be compelled to produce the information sought in this motion.

**Conclusion.**

Defendant does not make this request lightly. Mr. Tejada anticipates that the government will claim that it does not consider the information sought to be exculpatory. This argument is misplaced. The Supreme Court recognizes that "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate." Dennis v. United States, 384 U.S. 855, 875 (1966).

/s/ Thomas G. Briody

R.I. Bar no. 4427
The Remington Building
91 Friendship Street
Third Floor
Providence, RI 02903
(401) 751-5151
(401) 421-0876 (fascimile)
Tbriodylaw@aol.com

The undersigned certifies that a true copy of this motion was filed electronically and distributed to all parties on this 4th day of October, 2007.

/s/Thomas G. Briody