**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA**
**Plaintiff**

**vs.** **CR. 2007-005-S-LDA**

**EUDY TEJADA-PICHARDO**
**Aka Enoc Soto and**
**RICARDO MEJIA**

**RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE CONCERNING JOSEPH BROADMEADOW**

Mr. Tejada asks this court to deny the government's motion to exclude the opinion of Joseph Broadmeadow. The government's claims are misplaced. They rely on distorted interpretations of law and cases that are distinguishable from the instant matter. The government seeks to prevent the jury from hearing evidence that DEA agents failed to supervise the female subinformant. This lack of supervision actually contributed to improper inducement of Mr. Tejada, and raises reasonable doubt about the integrity of this investigation. The First Circuit has warned the government that it should take steps to reduce this sort of misbehavior. See United States v. Acosta, 67 F.3d 334, 341 (1st Cir. 1995). In this matter, the government failed to take those steps, and that failure should be considered by the jury in determining whether the government has met its burden of proof.

Mr. Broadmeadow's testimony is critical for the jury to fully appreciate the need for law enforcement officers to supervise and control their informants, particularly in light of the apparent failure to supervise the female subinformant, who government

agents knew was in contact with another informant, Lisa Torres, who is now accused of lying to federal agents and prosecutors. See Defendant's Motion for Exculpatory Evidence Pertaining to Lisa Torres, et al., (Doc. 126).

Mr. Broadmeadow's fingerprint testimony is offered to rebut the testimony of Patricia Cornell, an expert that the government seeks to call—apparently to explain its failure to obtain Mr. Tejada's fingerprints from items such as guns, plastic bags and other surfaces that the he allegedly handled. The government further misunderstands Mr. Broadmeadow's proposed testimony about street level drug sales, as opposed to multi-kilo deliveries. His knowledge and experience addresses the nature of "street level" versus "wholesale" drug trafficking in this area, something that is beyond the understanding of the jury. These arguments are set forth in greater detail below.

**Facts**

Mr. Tejada was arrested along with a codefendant on December 18, 2007. The charges evolved from an investigation in which the female subinformant played a substantial role. The female subinformant appears to have been responsible for setting up the sale of narcotics. She encountered Mr. Tejada on her own, and enlisted his aid in a drug transaction. She contacted "Jose," the primary informant, via cell phone and placed Mr. Tejada on the telephone. The defendant is overheard on surveillance recordings indicating that he does not know the way to Providence and that the female subinformant has to drive. The female subinformant comes to Rhode Island in her own car and, according to TFA Colanduano, she carried the suitcase containing suspected cocaine in her backseat. There is no evidence that she was searched by agents prior to the trip to Rhode Island.

The female subinformant was no ordinary cooperating witness. According to a recording made by TFA Naylor, she was introduced to the Agent Naylor by Lisa Torres, a DEA informant who is presently under indictment in Massachusetts for obstructing justice and lying to federal prosecutors.[1] Upon information and belief, Ms. Torres has been deactivated as an informant. Ms. Torres also worked as a "paralegal" for John Cicilline, the attorney who represented the female subinformant's husband. Mr. Cicilline is a codefendant with Ms. Torres in the same Masschusetts indictment, charged with lying to a federal prosecutor and conspiring to arrange phony "credit" for clients seeking reduced sentences in a federal drug prosecution. The "credit" was allegedly obtained by setting up drug transactions, and then falsely telling federal agents and prosecutor's that clients of Mr. Cicilline and Ms. Torres were responsible for providing information that led to drug arrests.

Federal agents provided minimal supervision to the female subinformant. In fact, TFA Naylor, the female subinformant's "handler" has testified that the subinformant was "utilized" but not "supervised." See Transcript, Suppression hearing, USA v. Tejada, July 5, 2007, pp. 43-44. The female subinformant essentially freelanced for the DEA, attempting to provide them with some sort of evidence that would lead to a drug arrest, and perhaps reduce her husband's prison sentence. The agents did not begin surveillance procedures until very late in the investigation, when the female subinformant had already lined up the defendant and targeted him.

On January 20, 2007, following Mr. Tejada's indictment and the indictment of Ms. Torres, Agent Naylor secretly recorded a conversation with the female subinformant. Agent Naylor brought up the subject of Lisa Torres, and indicated that he understood that

[1] See Transcript dated August 27, 2007, previously filed under seal with this court.

the two women were friends and would continue to see each other, but warned the subinformant not to do anything "criminal" with Ms. Torres. Agent Naylor, apparently recognizing that he had not documented the female subinformant's contact with the defendant until days before his arrest, got the female subinformant to agree that the defendant's case was not "mixed up" with Lisa Torres. There is no independent government documentation of this fact.

On August 27, in another secretly recorded conversation, Agent Naylor learned that the female subinformant was being sought for questioning by the FBI about Lisa Torres. In this recording, Agent Naylor states that he told the subinformant he wanted "nothing to do" with Lisa Torres, and reminded her of "what I told you, you have to stay away" from Lisa Torres. There is no evidence that Agent Naylor ever attempted to investigate the relationship between Torres and the female subinformant, other than cursory statements that he wanted to be sure that the cases are not "mixed" with one another.

The defendant in this case is expected to testify that the female subinformant placed substantial pressure on him to assist her in completing a drug transaction. He will testify to facts that will show that she preyed upon his friendship, his sympathy, and his romantic interest in her, all in an effort to obtain his cooperation. The female subinformant did this in the belief that she could obtain her husband's release from prison.[2]

[2] On January 20, Agent Naylor told the female subinformant that he wanted to correct her misimpression that her husband would be released from jail, and would instead receive a shorter sentence on his heroin conviction. He also indicated that the prosecutor in Rhode Island was attempting to obtain a dismissal of charges against the female subinformant's husband in New York.

The government has produced no evidence that, prior to his arrest in this case, Mr. Tejada had ever engaged in a large, "wholesale" drug transaction. The only evidence produced by the government in response to a 404(b) request is an arrest for street level crack delivery in August, 2005. The government expects to argue that this evidence shows that the defendant—who is indigent and has appointed counsel-- was predisposed to engage in a large scale delivery of powder cocaine worth tens of thousands of dollars.

## ARGUMENT

### The Failure of the DEA to Supervise Informants is Relevant and Material, and Expert Testimony Will Assist the Jury

The government claims the expert testimony about its agents' handling of the subinformant is "not appropriate" and "more suited to closing argument."[3] The government claims that Mr. Broadmeadow's testimony has "no bearing on the central issue of this case, namely, the defendant's intent." While the government may believe that intent is the central issue, the defendant disagrees. In an entrapment case, government behavior is also at issue. In every criminal case, the government's duty to meet its burden of proof is an issue for the jury.

The failure of government agents actually contributed to the defendant's improper inducement. Further, the failure of the police to monitor the subinformant compromised the integrity of the investigation. Because the average juror is unlikely to understand

[3] The government overlooks the fact that it intends to offer "opinion" testimony from a multitiude of law enforcement officers regarding the "methods and operations unique to the narcotics business." The government also intends to introduce "testimony about the techniques used by law enforcement in a narcotics investigation." The government also intends to elicit testimony about "tactics" used by law enforcement, including the use of "confidential informants and cooperators." See Govt's Trial Memorandum, p. 6. The defendant's use of an expert to render an opinion about these tactics and techniques is fair an appropriate in the context of this case.

how informants operate, much less the restrictions and regulations placed on authorities who are supposed to supervise them, Mr. Broadmeadow's testimony is appropriate under FRE 702.

Entrapment is neither a doctrine of constitutional dimension, nor a defense specifically granted by statute. United States v. Luisi, 482 F.3d 43, 52 (1st Cir. 2007), citing United States v. Russell, 411 U.S. 423, 432-33 (1973). Rather, the defense has its origins in an inference about congressional intent. Sherman v. United States, 356 U.S. 369, 372 (1958); see also United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994). The Supreme Court has explained that the "function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. . . . Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." Sherman, 356 U.S. at 372.

Entrapment has two elements. A defendant is entrapped where he is, first, improperly induced by the government or its agent to commit a crime and, second, the defendant otherwise lacked the predisposition to commit the crime. Where entrapment is an issue before the jury, the government must prove beyond a reasonable doubt that the defendant was not entrapped. United States v. Walter, 434 F.3d 30, 37 (1st Cir. 2006).

Improper inducement occurs when governmental deception or instigation actually implants the criminal design in the defendant's mind. United States v. Gamache, 156 F.3d at 9 (1st Cir. 1998). While there is no clear formula or definition of improper inducement, it may include persuasion, false statements, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged. But where there is proof of an opportunity plus "something else," then improper

inducement may be found to exist. See United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996), United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994). Preying upon a person's sympathy or friendship, or arm-twisting based on need, may also be improper inducement. See Sherman, 356 U.S. at 374, United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994). An informant, while not a law enforcement officer, is a government agent, and the government is responsible for the informant's conduct. Sherman v. United States, 356 U.S. at 373-375 (1958), cited in United States v. Luisi, 482 F.3d. 43(1st Cir. 2007) (It is "beyond dispute" that an individual hired or otherwise enlisted by the government for work as in informant is a government agent for entrapment purposes.)

Under the Attorney General's Guidelines Regarding the Use of Confidential Informants ("Informant Guidelines") executed on May 30, 2002, a federal agent

1. is never permitted to authorize an informant to "initiate or instigate a plan or strategy to commit a state or local criminal offense." Informant Guidelines, Sec. III (C)(1)(iv);
2. must take all reasonable steps to "***supervise closely the illegal activities of the CI***"; Informant Guidelines, Sec. III, (C)(5)(i)(emphasis added); and
3. absent exceptional circumstances, must not initiate contact with nor respond to contacts from a former CI who has been deactivated for cause: Informant Guidelines, Sec. V (C).

The DEA's own manual sets forth strict procedures for informants during controlled drug purchases:

> Where an informant is to participate in an undercover purchase in which he may come in contact with… controlled drugs… he will be thoroughly searched both before and after the undercover encounter, and where possible kept under continous observation in between. ***The***

> ***reason for this is to preclude questions as to the validity or integrity of the evidence.***

DEA Manual Chapter 66, Subsection 6612.31 (G) (emphasis added).

A dozen years ago, in United States v. Acosta, this Circuit expressed concern about the government's cavalier approach to the handling of informants:

> In his dual role as both instigator and witness, the informant has a special capacity--as well as strong incentive--to tilt both the event itself and his testimony about it. If the government is going to use its informants in a role just short of provocateur, ***it would be well advised to consider devising restrictions that will at least lessen the likelihood for abuse.***

Acosta, 67 F.3d at 341 (emphasis added).

The evidence in this case shows that the government either fails to follow its own informant guidelines, or is simply unaware of them. Agent Naylor has resisted questions that suggest he has a duty to supervise informants. The female subinformant in this case conducted a substantial portion of her "work" without oversight or monitoring. According to his suppression hearing testimony, Agent Naylor provided minimal training to the subinformant, other than to say he was looking for drug dealers and not bystanders. See Transcript, Suppression Hearing, p. 45 ("I wasn't instructing her and teaching her how to do things… One of the things I tell all the informants is we want drug dealers. We don't want somebody who is doing a favor. We don't want runners. We want somebody bigger than the person we arrested.")

Mr. Broadmeadow's testimony is offered to show the jury a world they know little about: criminal drug investigations and informants. His testimony will reveal why supervision of informants is so critical to maintaining the integrity of a drug investigation. While Mr. Broadmeadow will not offer an opinion as to whether the defendant was improperly induced, his expertise will explain why the chance for such

improper inducement was increased by the failure of the agents to supervise the female subinformant.

The government suggests that the defendant has offered no criteria by which to gauge Mr. Broadmeadow's opinion. The Informant Guidelines illustrate several areas where Agent Naylor and his colleagues fell short. The defendant expects to offer evidence that the female subinformant initiated the crime. He further expects to show an absence of supervision. Finally, he will show that this failure was critical in a situation where the subinformant was introduced to Agent Naylor by a notorious individual, Lisa Torres, an apparently deactivated informant who Naylor considered to be so untrustworthy that he has previously described her as "devious" and "shady."

The cases cited by the government are readily distinguishable from this matter. United States v. Washington, 106 F.3d 983 (D.C. Cir. 1997) was a police corruption case in which the defendants sought to introduce police expert testimony that their training was "insufficient to prepare young officers to identify and resist corrupt overtures." The district court excluded the proposed testimony on the ground it was not relevant to the question of the defendants' predisposition. Here, the issue of supervision (or more appropriately, the lack of supervision) goes primarily to the issue of inducement.

In United States v. Manning, 79 F.3d 212 (1996), the First Circuit refused to permit a fingerprint expert in a case where the defendant was charged with possession of cocaine, a firearm and six pipe bombs after police observed him carrying a suitcase containing the contraband into a garage. The court noted that Manning sought the expert for testing of fingerprints on a basement window and on the pipe bombs. The court found any evidence that could have been developed through the expert would be

"peripheral," because Manning was observed carrying the suitcase. In this case, the question of improper inducement is obviously central to a jury's determination.

United States v. Hirschberg 988 F.2d 1509 (7th Cir. 1993) excluded the testimony of an Illinois detective who sought to testify about the practices of a Miami officer. In United States v. Rouco, 765 F.2d 983 (11th Cir. 1985) the court upheld exclusion of testimony about inadequate arrest procedures because it was irrelevant, potentially confusing and misleading. Neither Hirschberg nor Rouco lend support to the government's argument. [4]

Mr. Tejada should be permitted to present Mr. Broadmeadow and to offer his view of the lack of supervision of the female subinformant. The DEA and other federal, state and local agencies have procedures in place to deal with this type of situation, and when they fail to follow procedures they should be called to account. As this court has recently observed:

> Where simple and efficient reforms of the investigative and information-gathering stages offer the possibility of increasing the accuracy of criminal convictions, law enforcement agencies should move swiftly toward their implementation. Failure to take such action effectively pits these agencies against the truth-seeking process, imperils an already vulnerable criminal justice system, and will be met with corrective action by this court.

Decision and Order, United States v. Mason, Cr. No. 06-106-02S, July 20, 2007, p. 20.

---

[4] The government also cites unpublished decisions from the 4th Circuit. These opinions have no precedential value.

**Mr. Broadmeadow's Fingerprint Testimony**
**Is Fair and Appropriate Rebuttal of the Government's Expert**

The government has announced its intention to call a fingerprint expert, Patricia Cornell. Ms. Cornell may testify regarding tests performed during fingerprint analysis in this case, and "regarding the conditions that may impede an investigator's ability to recover fingerprints." Govt. Discovery letter, dated August 8, 2007. The government apparently hopes to explain to the jury why it failed to obtain the defendant's fingerprints.

If the government chooses to open this door, Mr. Broadmeadow's testimony should be offered to rebut it. Mr. Broadmeadow has extensive experience in narcotics investigations, and knows the reasons why law enforcement agents use BCI specialists. In his experience, it is indeed unusual to not identify a single print from the materials seized by the government. It is only fair, given the government's notice of its intention to call Detective Cornell, that the defendant be permitted to offer testimony as to potentially exculpatory reasons why prints were not recovered.

**Mr. Broadmeadow Should Be**
**Permitted to Testify Regarding the Distinctions**
**Between Street Level and Wholesale Level Trafficking**

The government seeks to bar Mr. Broadmeadow from offering testimony about what it characterizes as "predisposition." If Mr. Broadmeadow were to opine about the nature of Mr. Tejada's mental state, the government's position would be well taken. But that is not the testimony the defense seeks to offer. As noted in the discovery letter submitted to the government, Mr. Broadmeadow is a highly experienced narcotics investigator. He understands the structure of drug trafficking enterprises at least as well

as if not more than the investigators the government seeks to call as experts on narcotics trafficking.

Mr. Broadmeadow is expected to testify about the structure of drug enterprises, and the kinds of individuals who participate in them. This is the same sort of evidence that the government has indicated it will offer in its case in chief. The government plans to call its agents to testify about "methods and operations" of the narcotics business. It has also indicated that it will call Massachusetts detectives to testify regarding their observations of the defendant in August, 2005, and will suggest to the jury that, because Mr. Tejada allegedly sold $100 worth of crack to an addict, he was predisposed to engage in a wholesale cocaine transaction worth tens of thousands of dollars.

As with the fingerprint evidence issue, Mr. Broadmeadow's testimony is offered to rebut the government's evidence. He is not expected to testify concerning the defendant's state of mind, nor is he expected to testify about the defendant's intent. Instead, Mr. Broadmeadow will testify about the nature of drug trafficking and the illicit industry that surrounds it. He is expected to explain the difference between street level sales and larger deliveries of multiple kilograms.

The defendant's discovery letter states that, in Mr. Broadmeadow's experience, "it is highly unusual for a person who may have engaged in a small, street level delivery to next engage in a two kilogram delivery." The letter further states that "[p]ut another way, an alleged street dealer is not necessarily predisposed to engage in a five figure drug delivery." This is not to say that Mr. Broadmeadow will offer an opinion about the defendant's mental state. It simply means that street dealers do not commonly and

quickly move "up the chain" of distribution from street level to wholesale level. A jury should be permitted to hear that information in the context of this case.

In determining whether the government has proved beyond a reasonable doubt that a defendant was predisposed to commit a crime, the jury may consider (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by a government agent or informant; (3) whether the defendant agreed to commit the crime for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by government persuasion; and (5) ***the nature of the inducement or persuasion offered by the government***. United States v. Gamache, 156 F.3d 1, 6 (1st Cir. 1998) (emphasis added). Proof that a defendant engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing. Jacobson v. United States, 503 U.S. 540, 551 n.3. The fact that a defendant has a prior criminal record, by itself, is not enough to conclusively establish predisposition. See Acosta, 67 F.3d at 339 (defendant's three prior drug trafficking convictions are not enough to show he was "predisposed" to traffic in firearms).

Here, the defendant seeks to offer testimony that will illustrate to lay jurors that not all alleged drug traffickers are the same. This is only fair, and a reasonable response to the government's plan to present its case through police "experts."

**Conclusion**

For all the reasons set forth herein, the government's motion should be denied.

/s/ Thomas G. Briody
R.I. Bar no. 4427
The Remington Building
91 Friendship Street
Third Floor
Providence, RI 02903
(401) 751-5151
(401) 421-0876 (facsimile)
Tbriodylaw@aol.com

The undersigned certifies that this motion was filed electronically and distributed to all parties via the ECF system on October 9, 2007.

/s/Thomas G. Briody