**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **VS.** | ) | **CR No. 07-005S** |
| | ) | |
| **EUDY ANTONIO TEJADA PICHARDO** | ) | |
| **and** | ) | |
| **RICARDO MEJIA** | ) | |

**DEFENDANT TEJADA'S TRIAL MEMORANDUM**

This is a drug prosecution involving a firearm, informants, and mandatory minimum sentences. Eudy Tejada was arrested in the company of two informants who solicited and planned a drug transaction outside a MacDonald's in Providence, Rhode Island. His codefendant, Ricardo Mejia, was arrested with them. Mr. Tejada is charged with possession of slightly less than two kilograms of cocaine with intent to deliver, and conspiracy. Mr. Mejia is charged separately with possession of a firearm in furtherance of a drug conspiracy.

Mr. Tejada has no obligation to present evidence, call witnesses, or respond in any manner to the government's allegations. He is presumed to be innocent of these charges. Mr. Tejada may, as has been noted in pre-trial hearings, present a defense based on entrapment. Mr. Tejada reserves the right to present other defenses, including but not limited to, raising reasonable doubt as to whether the government has met its burden of proof.

**ENTRAPMENT**

Mr. Tejada's theory is that the female informant, the wife of a convicted drug trafficker desperate to minimize her husband's prison sentence, improperly persuaded

him to engage in a drug delivery. Mr. Tejada had no convictions for drug trafficking before meeting the female informant, and was not predisposed to engage in such conduct.

Mr. Tejada lived in Lawrence, Massachusetts in 2005 and 2006. Mr. Tejada used his earnings to send money home to his mother and his young daughter in the Dominican Republic. Mr. Tejada came to this country without proper documentation. He obtained documents in Puerto Rico under the name "Enoc Soto." He used these documents in order to work and live in the United States. Mr. Tejada was charged with selling a small, street level quantity of cocaine in 2005. The charge was later dismissed. Apart from this arrest, he has no criminal history.

Mr. Tejada met the female informant through mutual acquaintances. Over a period of several months, Mr. Tejada developed a friendship with the female informant. The informant told him that her life was very difficult, and that she needed money to support her children.

Sometime in the late fall of 2006, the informant told Mr. Tejada that she knew a man in Providence who would be willing to pay for cocaine, and asked him if he knew anyone who could find drugs to sell. Mr. Tejada resisted this request. The female informant continued to ask Mr. Tejada to look for someone who could help her, indicating that she needed money. She also said that she would give Mr. Tejada a small amount of money in exchange for helping her.

Mr. Tejada did not know that the female informant's husband had been tried and convicted in the United States District Court in Providence of trafficking in heroin. He did not know that the female informant had agreed to cooperate in hopes of obtaining her husband's release. He did not know that her husband's lawyer, a criminal defense

attorney in Rhode Island, was under federal investigation for making false statements to federal authorities and for obstructing justice—by convincing individuals to make false statement to investigators about drug activity, in hopes of obtaining a lighter punishment for friends and relatives who had been convicted of drug trafficking.[1] He did not know that the female subinformant was an acquaintance of Lisa Torres, a notorious informant who was viewed as untrustworthy by DEA agents, or that Lisa Torres introduced the female subinformant to the authorities. He did not know that Ms. Torres was also under federal investigation.

Mr. Tejada reluctantly agreed to search for cocaine. He also agreed—at the female informant's request-- to speak to a man that the female informant identified as "Jose." "Jose" claimed in telephone conversations to be a drug dealer in Rhode Island. The female informant was the contact person for "Jose" but "Jose" claimed that drug dealing was a "man's business." "Jose" repeatedly asked Mr. Tejada to come to Rhode Island to complete a drug delivery. Mr. Tejada did not know the way to Rhode Island, but the female informant offered to drive him.

Mr. Tejada finally approached his codefendant, Ricardo Mejia, and explained that his female friend wanted to make money by selling cocaine. He asked Mr. Mejia whether he knew anyone who might be able to supply a sizeable quantity of cocaine. Mr. Mejia eventually contacted Mr. Tejada. On December 18, 2006, Mr. Tejada, accompanied by

---

[1] The defendants have filed extensive Brady and Giglio motions in this case, seeking impeachment information. The government has resisted efforts to learn specific information about the informants, and referred to the female subinformant as providing assistance only to a "family member." Given the sordid nature of the allegations concerning counsel for the subinformant's husband, the defendant respectfully reminds the government that any information concerning the informant's motivations to cooperate with the government, including negotiations for her services by the attorney for her husband, may qualify as Brady material and should be disclosed. The Supreme Court recognizes that "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate." Dennis v. United States, 384 U.S. 855, 875 (1966).

Mr. Mejia, met with the female informant, and she drove them both to Providence. There, in a parking lot near a McDonald's restaurant, the police arrested Mr. Tejada. He gave the police the name he had on his immigration papers: Enoc Soto. Mr. Tejada maintains that, but for the entreaties of the female subinformant—which will be set forth in greater detail at trial—he would not have approached Mr. Mejia, nor would he have accompanied her on the fateful December 18 trip to Providence.

Entrapment is an affirmative defense. It is neither a doctrine of constitutional dimension, nor a defense specifically granted by statute. United States v. Luisi, 482 F.3d 43, 52 (1st Cir. 2007), citing United States v. Russell, 411 U.S. 423, 432-33 (1973). Rather, the defense has its origins in an inference about congressional intent. Sherman v. United States, 356 U.S. 369, 372 (1958); see also United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994). The Supreme Court has explained that the "function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. . . . Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." Sherman, 356 U.S. at 372.

Entrapment has two elements. A defendant is entrapped where he is, first, improperly induced by the government or its agent to commit a crime and, second, the defendant otherwise lacked the predisposition to commit the crime. Where entrapment is an issue before the jury, the government must prove beyond a reasonable doubt that the defendant was not entrapped. United States v. Walter, 434 F.3d 30, 37 (1st Cir. 2006), United States v. Glaum, 356 F.3d. 169 (1st Cir. 2004).

In order to obtain an entrapment instruction, a defendant has a low entry level burden. United States v. Teleguz, No. 06-1751 (1st Cir., July 24, 2007), United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998). In assessing whether the entry-level burden for an instruction has been met, the court must look at the evidence most charitably to the defendant and determine whether it could be sufficient for a reasonable jury to conclude that there was entrapment. United States v. Rodriguez, 858 F.2d 80, 813 (1st Cir. 1988). Even the statements of a defendant that some might view as self-serving can, in appropriate circumstances, be sufficient to warrant an entrapment instruction. Id. In essence, the decision as to whether a particular defendant is entrapped should be left to the jury.

Improper inducement occurs when governmental deception or instigation actually implants the criminal design in the defendant's mind. United States v. Gamache, 156 F.3d at 9 (1st Cir. 1998). While there is no clear formula or definition of improper inducement, it may include persuasion, false statements, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged. A "sting" operation is not improper inducement if it merely provides an opportunity to commit a crime. But where there is proof of an opportunity plus "something else," such as repeated suggestions over time, then improper inducement may be found to exist. See United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996), United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994). Preying upon a person's sympathy or friendship, or arm-twisting based on need, may also be improper inducement. See Sherman, 356 U.S. at 374, United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994).

In large part, predisposition turns on making a judgment as to how a defendant of a given character, background and behavior would have acted in somewhat different circumstances. In other words, how would the defendant respond if he were not improperly induced? See United States v. Acosta, 67 F.3d 334, 338 (1st Cir. 1995). In determining whether the government has proved beyond a reasonable doubt that a defendant was predisposed to commit a crime, the jury may consider (1) the character or reputation of the defendant; (2) whether the initial suggestion to engage in criminal acts was made by a government agent or informant; (3) whether the defendant agreed to commit the crime for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by government persuasion; and (5) ***the nature of the inducement or persuasion offered by the government***. United States v. Gamache, 156 F.3d 1, 6 (1st Cir. 1998) (emphasis added). This last point is important; it means that the jury must consider what the government did to persuade the defendant, not only for inducement purposes, but also to determine whether the defendant was predisposed.

Proof that a defendant engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing. Jacobson v. United States, 503 U.S. 540, 551 n.3. The fact that a defendant has a prior criminal record, by itself, is not enough to conclusively establish predisposition. See Acosta, 67 F.3d at 339 (defendant's three prior drug trafficking convictions is not enough to show he was "predisposed" to traffic in firearms).

**CROSS-EXAMINATION OF WITNESSES**

Mr. Tejada intends to challenge the credibility of the government's witnesses, particularly the primary informant and the subinformant, in the event they are called as witnesses. Mr. Tejada intends to cross-examine Task Force Agent Naylor regarding the instructions given to the female subinformant. TFA Naylor has testified that he instructed the female subinformant that he (Naylor) wanted nothing to do with Lisa Torres, a former informant who he believed to be unreliable and untrustworthy. Reglardless of this fact, TFA Naylor has testified that the female subinformant brought up Lisa Torres's name on approximately half a dozen occasions during the course of the investigation of Mr. Tejada. The DEA has also produced telephone records that show that the female subinformant was in daily contact with Lisa Torres. Most importantly, the records show that Ms. Torres spoke with the female subinformant on the day the defendant was arrested, and that she owed Ms. Torres money.

The defendant further intends to examine the subinformant about her adherence to Agent Naylor's instructions. This information is not collateral; it is critical to the jury's assessment of the credibility of the female subinformant. In an entrapment case, it is also critical to the jury's assessment of whether the informant—a government agent—followed the instructions of the agent who supervised her.

The Sixth Amendment of the United States Constitution guarantees a defendant the right to confront the witnesses against him. Further, under Federal Rule of Evidence 607, the credibility of a witness may be attacked by any party. In this case, where the

defendant asserts the affirmative defense of entrapment, the credibility of the government's informants is of special significance.

To meet the constitutional standard, the district court "must ensure that the jury is provided with 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias.'" See United States v. Callipari, 368 F.3d 22 (1st Cir. 2004), quoting United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988) (quoting United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986) (quoting United States v. Campbell, 426 F.3d 547, 550 (2d Cir. 1970))).

As Judge Wisdom of the Fifth Circuit wrote in United States v. Mayer, 556 F.2d 245 (5th Cir. 1977):

> A defendant's right to cross-examine fully the witnesses against him is one of constitutional dimensions, secured to federal defendants under the confrontation clause of the sixth amendment. Alford v. United States, 1931, 282 U.S. 687, 51 S. Ct. 218, 75 L. Ed. 624; United States v. Morris, 5 Cir. 1973, 485 F.2d 1385, 1386-87.
>
> Moreover, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347, 354. (1974).
>
> ****
>
> "Cross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope". United States v. Partin, 493 F.2d 750, 763, (5th Cir. 1974), quoting McConnell v. United States, 393 F.2d 404, 406 (5th Cir. 1968). ***This is especially true where a prosecution witness has had prior dealings with the prosecution or with other law enforcement officials, so that the possibility exists that his testimony was motivated by a desire to please the prosecution in exchange for the prosecutor's actions in having some or all of the charges against the witness dropped***, United States v. Onori, 535 F.2d 938, (5th Cir. 1976), ***securing immunity against prosecution for the witness***, United States v. Dickens, 8 Cir. 1969, 417 F.2d 958, ***or attempting to assure that the witness receives lenient treatment in sentencing***, Beaudine v. United States, 368 F.2d 417, (5th Cir. 1966), (emphasis added).

**TRANSCRIPTS/RECORDINGS**

The government made recordings in this case, and produced transcripts. The transcripts are written in English, and offer no point of reference for the Spanish phrases that are translated.

Further, the recordings are broken up, and start in the middle of conversations. The recordings provided to the defendant are not clearly identified by date and time. Further, the transcripts do not accurately depict the conversations. The defendant has obtained transcripts from an independent interpreter/translator, and these transcripts appear to be more thorough—they set forth the Spanish language phrase, followed by the English translation. In addition, the independent interpreter has translated some phrases that were not translated by the government. Mr. Tejada has produced these transcripts to the government.

The defendant has previously filed transcripts of recordings made by TFA Naylor of the female subinformant. Mr. Tejada may use those transcripts during trial.

**MR. TEJADA'S STATEMENT**

Mr. Tejada gave a statement to Detective Perez and TFA Naylor. Detective Perez and Agent Naylor chose not to record the statement, though they clearly had access to recording equipment. Their choice to not record the statement of Mr. Tejada undermines the trustworthiness of the statement. The defendant asks this court to give a cautionary

instruction to the jury at the time Detective Perez and TFA Naylor testify, and during final instructions. The defendant relies on Commonwealth v. DiGiambattista, 813 N.E. 2d 516 (2004) (holding that failure to electronically record a statement entitles defendant to cautionary instruction). In reaching its holding, the SJC recognized

> the exceptionally potent quality of a defendant's statement or confession, and that potency can only be magnified when the evidence of that statement is presented by one or more of the interrogating officers. Where, however, those interrogating officers have chosen ***not*** to preserve an accurate and complete recording of the interrogation, that fact alone justifies skepticism of the officers' version of events, above and beyond the customary bases for impeachment of such testimony.

DiGiambattista, 813 N.E.2d at 533 (emphasis in original).

Mr. Tejada asks the court to provide this instruction to the jury at trial.

**EXPERTS**

The government has noticed its intent to call police "experts," including TFA Naylor, DEA agents, Detective Perez and a fingerprint expert from the Providence police department. The police experts will testify that the amount of cocaine seized was presumptively for distribution, about the "tactics" used in drug investigations, and the "methods and operations unique to narcotics trafficking." The fingerprint expert is expected to testify regarding tests she performed and the results of her examination. She may also testify "regarding conditions that may impede an investigator's ability to recover fingerprints. The defense has moved to preclude the use of this expert testimony,

and particularly the testimony of Agent Naylor regarding "code" language and the "tactics" used to combat drug trafficking.

The defense has further notified the government of its intent to present its own expert. The defense expert, Joseph Broadmeadow, is a retired police detective with extensive background and experience in drug investigations. The extent to which this testimony shall be admitted is the subject of motions before this court. It is certainly true that the government may offer expert testimony in certain circumstances to inform a jury as to issues that may assist them in reaching a verdict. But as Judge Selya has taught in another context, "in fairness, what is sauce for the defendant's goose is sauce for the government's gander." United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995). The government hopes to show the jury its extraordinary efforts in this investigation, and the nature of drug trafficking enterprises. Mr. Broadmeadow is expected to expose the warts in that investigation.

**MISSING WITNESS**

The government initially failed to disclose that a female subinformant was involved in this case. When pressed by the defendant, and following motions to disclose the identities of informants, the government finally disclosed the subinformant's identity.

The prosecutor thereafter went to great lengths to prevent the defendant from independently investigating the subinformant's background. The proseuctor refused to provide an address where the subinformant could be found, and did not disclose any personal information. When disclosure of the subinformant's identity was made, the prosecutor authorized payment of 2500 dollars, and told the defendants that she was assisting the subinformant in relocating.

The government has refused to identify the person on whose behalf the subinformant provided cooperation, saying only that the person was a "family member." The defendant has since determined that the "family member" is in fact the defendant's husband. The government made the subinformant available to the defendant. The subinformant appeared for a meeting in the presence of TFA Naylor, DEA Agent Cardello and the primary informant at the grand jury rooms in Providence. Both informants refused to provide any information to counsel for the defendants, and left the meeting under escort from TFA Naylor and SA Cardello. Because of the government's efforts, Mr. Tejada has been unable to investigate the background of the subinformant and to determine whether she should be called as a witness at trial. The prosecutor has indicated that she may not call the subinformant as a witness.

The female subinformant did testify following a court order authorizing a limited hearing regarding her communication with Lisa Torres near the time of Mr. Tejada's arrest. The female subinformant testified that she could not remember telephone conversations with Ms. Torres, other than one in which she discussed a debt to Ms. Torres. Confronted with evidence of 39 separate telephonic contacts between the female subinformant and Lisa Torres on December 18, 2006, the female subinformant claimed she did not have her personal cell phone with her. The defendant requested cell site data to confirm or impeach the female subinformant's uncorroborated testimony. Due to the delay in disclosing the female subinformant's relationship with Lisa Torres, the cell phone carrier indicates that the records no longer exist.

Under these circumstances, the defendant asks that this court provide a "missing witness" instruction. The rationale behind a missing witness instruction is that upon " the

failure of a party to produce available evidence that would help decide an issue," the jury may infer "that the evidence would have been unfavorable to the party to whom it is available or whom it would ordinarily be expected to favor." United States v. Perez, 299 F.3d 1, 4 (1st Cir. 2002), United States v. St. Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989). A missing witness instruction is proper when a witness is either actually unavailable to the party seeking the instruction or so obviously partial to the other side that the witness is deemed to be legally unavailable. United States v. Spinosa, 982 F.2d 620, 632 (1st Cir. 1992). To obtain the instruction a criminal defendant must demonstrate that the uncalled witness is either "favorably disposed" to testify on behalf of the government by virtue of status or relationship, or is "peculiarly available" to the government. United States v. DeLuca, 137 f.3d 24, 38 (1st Cir. 1998). Where the court finds either one of these factors, it must consider the explanation for the witness's absence and whether, if called, the witness would be likely to provide relevant, non-cumulative testimony. Perez, 299 F.3d at 4-5, United States v. Lewis, 40 F.3d 1325, 1336 (1st Cir. 1994). If the court so finds, it may instruct the jury that "where a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121 (1893).

In this case, the government has taken steps to prevent the defense from locating and independently investigating the subinformant. It has made the subinformant available, but only under the watchful eye of the case agent and his partner. The subinformant has refused to speak to defense counsel and his investigator. She cooperated with the authorities, apparently for the purpose of assisting her husband in

obtaining a lower sentence. Counsel has no way to locate the informant independently, and the prosecutor helped the informant to relocate. In these circumstances, this court should find that the female subinformant is peculiarly unavailable, and favorably disposed toward the government.

The defendant has served notice of his intention to argue entrapment. He intends to show that the subinformant, a government agent, improperly induced him. One would expect, if the female subinformant could rebut these assertions, she would testify on behalf of the government. If the subinformant does not take the stand, the defendant submits that a missing witness instruction is proper.

**SPOLIATION OF EVIDENCE**

Due to the government's failure to timely disclose the relationship between the female subinformant and Lisa Torres, evidence pertaining to their cellular telephone communications—specifically cell cite usage data-- has been lost. This is critical evidence that could be used to impeach the female subinformant's claim that she did not speak with Lisa Torres at critical points during the government's investigation.

The "spoliation" doctrine affords injured parties a remedy when important evidence is lost through the conduct of the opposing party. See United States v. Shea, 211 F.3d 658 (1st Cir. 2000). While bad faith is ordinarily required before the court may impose a sanction, this circuit acknowledges that there may be extraordinary cases where the government's loss of evidence requires some remedy despite good faith. See United States v. Alston, 112 112 F.3d 32, 35 (1st Cir.) cert. denied, 522 U.S. 999 (1997).

The government did not, per se, destroy evidence in this case. However, the government did do the following:

(1) conceal the fact that the female subinformant worked for the DEA in its official DEA 6;

(2) fail to disclose the female subinformant's status as an informant until mid-March, 2007;

(3) fail to disclose the female subinformant's relationship with Lisa Torres until September, 2007.

(4) object to an evidentiary hearing to determine the female subinformant's relationship with Lisa Torres, and most specifically, why there was such an extensive exchange of telephone calls between them.

The government did this while knowing that Lisa Torres was under criminal investigation and later, indictment. The government was aware that Lisa Torres was "devious" and "untrustworthy." The government's explanation is that it essentially trusts that the female subinformant would keep her work as an informant separate from her relationship with Lisa Torres.

Accordingly, if the female subinformant does testify, Mr. Tejada asks this court to instruct the jury that, in addition to viewing an informant's testimony with skepticism, it may consider the failure of the female subinformant to provide any corroboration for her claim that (1) she "can't remember" her conversations with Lisa Torres; )2) she "never" discussed her work as an informant with Lisa Torres; and (3) that she did not use her personal cell phone on the night of December 18, 2006

**404(b) EVIDENCE**

At a motion hearing on August 29, this court ruled that if the defendant raises entrapment, the government will be permitted to introduce evidence of an August 2005 incident in which the defendant allegedly sold $100 worth of crack to a woman on the street in Lawrence, Massachusetts. The government does not intend to call the woman, and says it will instead call police officers to testify that (1) they observed the woman's car; (2) they observed a man they believe to be Mr. Tejada enter and leave the car; and (3) they stopped the woman, and found her to have a small quantity of crack.

Mr. Tejada objects to this evidence. Mr. Tejada submits that the evidence is unfairly prejudicial and likely to confuse the jury. He further notes that, standing alone, the evidence proffered by the government is insufficient to demonstrate the defendant's guilt on a charge of delivery. Given that this court has ruled, however, Mr. Tejada asks that the court direct the government to make sure that the police officers do not refer to any statement made by the woman arrested, nor offer any opinion, direct or indirect, as to Mr. Tejada's guilt in connection with that offense.

**PROPOSED VOIR DIRE**

1. Is there anyone here who belongs to an organization that is concerned with immigration into the United States or with immigration policy? If so, how long have you been involved in this organization?

2. Is there anyone here who feels strongly that persons who are not legally in this country don't deserve the rights, such as the right to a trial by jury, that citizens or lawful U.S. residents enjoy?

3. There are many Americans who believe that, if a person comes to the United States and stays for more than a few weeks, he or she should learn how to speak English. Is there anyone here who feels this way?

4. Is there anyone here who speaks the Spanish language? Could you tell us about your background?

5. Is there anyone here who works in law enforcement?

6. Is there anyone here who has a relative who works in law enforcement?

7. Some people believe that police or law enforcement officers are more believable as witnesses, simply because they work in law enforcement. Do you agree with this statement?

8. Is there anyone here who has had experiences with relatives or friends who have abused drugs? (Request sidebar to determine what that experience is and whether it would affect the juror's impartiality).

**JURY INSTRUCTIONS**

Jury instructions will be filed under separate cover.

/s/ Thomas G. Briody

R.I. Bar no. 4427
The Remington Building
91 Friendship Street
Third Floor
Providence, RI 02903
(401) 751-5151
(401) 421-0876 (facsimile)
Tbriodylaw@aol.com

The undersigned certifies that this motion was filed electronically and distributed to all parties via the ECF system on November 27, 2007.

/s/Thomas G. Briody