IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR 07-005S |
| | : | |
| EUDY TEJADA-PICHARDO a/k/a | : | |
| Enoc Soto | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The government recommends that the Court sentence the defendant, Eudy Antonio Tejada-Pichardo a/k/a Enoc Soto, to a term of imprisonment at the high end of the guideline range. The government bases its recommendation upon the following facts: (1) the defendant possessed 1.9 kilograms of cocaine, or $40,000 worth of cocaine, with the intent to distribute; (2) the defendant initially agreed to sell six kilograms of cocaine; (3) the defendant promised to deliver an additional 2 kilograms of cocaine to the informant; (4) the drug ledgers seized from the co-defendant's person and the defendant's car indicate a much larger conspiracy to distribute narcotics; and, (5) the offense involved a firearm. Given the nature and circumstances of the offense and the need for the sentence imposed, a sentence at the high end of the guideline range is reasonable.

FACTS AND TRAVEL

In the week preceding December 18, 2006, agents with the U.S. Drug Enforcement Administration (DEA) arranged to purchase cocaine from Tejada with the assistance of two informants. (PSR ¶ 9). There were several recorded conversations between Tejada

and the informants prior to the deal. Id. On December 18, 2006, at the scene of the cocaine deal, Tejada was removed from the male informant's vehicle along with a suitcase containing 1.9 kilograms of cocaine. Id. His co-defendant, Mejia, was removed from the front passenger seat of the female informant's vehicle. During a search of her car, the agents found a Highpoint .45 caliber pistol with an obliterated serial number. Id. The firearm was under the rear portion of the driver's seat. Id. During a search of Tejada's vehicle, agents found a wrench that fit the bolts of the suitcase and a drug ledger that bore similarities to the ledger seized from Mejia's person. Id.

During his post-arrest interview, Mejia told agents that he received the firearm from Tejada at McDonald's and that he placed it under the seat once inside the vehicle. (Tr., 7/5/08, p. 14, 68; DEA-6 Report of Investigation prepared by TFA Michael Naylor ¶ 19). He also said that he was there to protect Tejada and to "watch his back." (Tr., 7/5/08, p. 14). Tejada told agents that he was making $500 a kilogram. (Tr., 7/5/08, p. 11). He also told agents that the female informant had no knowledge of the firearm or the cocaine transaction. (Tr., 7/5/08, p.46; DEA-6 Report of Investigation prepared by TFA Michael Naylor ¶ 20).

Tejada pled guilty to conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine, and possession of 500 grams or more of cocaine with the intent to

distribute. After a jury trial, Mejia was convicted of conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine and possession of a firearm in furtherance of drug trafficking. He was acquitted of possession of 500 grams or more of cocaine with the intent to distribute.

In this case, the probation officer prepared a Presentence Report (PSR) in which she calculated Tejada's total offense level to be 25 and his criminal history category to be I. In making this determination, the probation officer found that Tejada distributed 1.9 kilograms of cocaine, which involved a base offense level of 26. See U.S.S.G. § 2D1.1(c)(7). The probation officer then credited him with 3 points for acceptance of responsibility, but increased his offense level by 2 points for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). Thus, the probation officer determined that Tejada's guideline range was 57-71 months; however, because a statutory minimum sentence of 60 months was in effect, the restricted guideline range was 60-71 months.

Tejada seeks a sentence below the statutory minimum sentence of 60 months arguing that he qualifies for the safety-valve.[1]

[1] Pursuant to U.S.S.G. § 5C1.2, the Court may impose a sentence below the statutory minimum sentence if the Court finds that the defendant meets the following criteria:
(1) the defendant does not have more than 1 criminal history

However, the government disputes that he is eligible for the safety-valve. As stated on the record at the plea colloquy, the government maintains that the firearm present in this case precludes Tejada from qualifying for the safety-valve. Specifically, the government contends that Tejada possessed the firearm and induced his co-defendant, Ricardo Mejia, to possess the firearm in connection with this offense. Additionally, Tejada failed to truthfully provide to the government all information and evidence that he had concerning the offense.

FIREARM

To qualify for the safety-valve under U.S.S.G. § 5C1.2(2), the defendant must prove by a preponderance of the evidence that he did not possess the firearm, or induce another participant to possess the firearm, in connection with the offense. See United States v. Anderson, 452 F.3d 87, 90-91 (1st Cir. 2006). Possession in this context may be active or constructive, sole or joint. See United States v. McLean, 409 F.3d 492, 501 (1st Cir.

---

point;

(2) the defendant did not . . . possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in serious injury;

(4) the defendant was not an organizer, leader, manager, or supervisor as determined under the guidelines and was not engaged in a continuing criminal enterprise; and,

(5) the defendant truthfully provided to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or a common scheme or plan.

2005). The inquiry is focused upon dominion and control, not ownership, and may be inferred from circumstances. See id. The defendant bears the burden of showing his entitlement to the safety-valve. See id. at 502.

Tejada apparently concedes that the firearm enhancement under § 2D1.1(b)(1) was appropriate[2]. Nonetheless, he contends that he is eligible for the safety-valve because he claims that he never had possession of the firearm or knowledge of it.

Under the facts of this case, the Court should find that the defendant has not met his burden. Tejada offers only his own self-serving denials in support of his contention that he had no knowledge of the firearm, yet, he has a track record for untruthfulness. Furthermore, Tejada's denials are contradicted by his own post-arrest statement and the other evidence in the case. When interviewed by law enforcement, Tejada implicitly conceded knowledge of the firearm when he claimed that the female informant did not know anything about it. Additionally, the co-defendant, Mejia, gave a post-arrest statement in which Mejia

---

[2] See United States v. Thongsophaporn, 503 F.3d 51, 58-59 (1st Cir. 2007) ("Because firearms are considered 'common tools of the drug trade,' a co-defendant's possession of a dangerous weapon is 'is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.'"); United States v. Bianco, 922 F.2d 910, 912-13 (1st Cir. 1991) (same); see also United States v. McLean, 409 F.3d 492, 499 & n.6 (1st Cir. 2005).

implicated both himself and Tejada when he told agents that Tejada gave him the gun and that he was present to provide Tejada protection. See United States v. Luciano, 414 F.3d 174, 180 (1st Cir. 2005) ("[T]here is no Sixth Amendment Confrontation Clause right at sentencing.").

In Luciano, the Court applied a four-level enhancement for possession of a weapon in connection with another felony offense under § 2K2.1(b)(5) based upon the hearsay statements of a witness. See id. at 181. The Court made this finding even though there was no showing of unavailability by the government and the hearsay statements were contradicted by a defense witness at sentencing. The Court found the hearsay statements to be sufficient to warrant the weapon enhancement and noted that the statements were more reliable because they were excited utterances.

Similarly, in this case, Mejia's statements regarding the firearm were more reliable because they were statements against his penal interest. See generally Fed. R. Evid. 804(b)(3). Furthermore, Mejia's statements were corroborated by the other evidence in the case. Specifically, the statements were corroborated by the manner in which Tejada and Mejia traveled to the drug deal; the fact that they entered and remained in McDonald's together; Mejia's behavior in the McDonald's parking lot; the drug ledgers seized from Mejia's person and Tejada's car

demonstrating the conspiracy; the location of the firearm; and, the firearm's condition of having an obliterated serial number.

A common sense view the events of December 18, 2006 adds weight to Mejia's statements. As demonstrated by the recordings, Tejada arranged this $41,000 drug deal. It is logical that he would want protection when delivering a large quantity of cocaine to an unknown customer in an unfamiliar city. Based upon the above, the Court should find that Tejada's denials and blame-shifting do not satisfy his burden under § 5C1.2.

INTERVIEW

As with the firearm provision under § 5C1.2, the defendant bears the burden of showing that he truthfully provided to the government all information and evidence that he had concerning the offense or offenses that were part of the same course of conduct or a common scheme or plan. See United States v. Matos, 328 F.3d 34, 39 (1st Cir. 2003). The First Circuit has stated that,

> This burden obliges the defendant to prove to the court that the information he supplied in the relevant time frame was both truthful and complete. Consequently, a safety valve debriefing is a situation that cries out for straight talk; equivocations, half-truths, and veiled allusions will not do. After all, Congress's evident purpose in creating the safety valve was to 'to mitigate the harsh effect of mandatory minimum sentences on certain first offenders who played supporting roles in drug-trafficking schemes.'"

Id.; United States v. Montanez, 82 F.3d 520, 523 (1st Cir. 1996).

In an attempt to satisfy his burden, Tejada submitted a statement to the probation officer entitled "Defendant's Version." Also, on April 28, 2008, at the request of Tejada's counsel, the government met with Tejada to provide him with an opportunity to satisfy the safety-valve should the Court disagree with the government's position regarding the firearm. However, the government contends that Tejada did not provide the government with a truthful and complete account of all the that information he had regarding the offense.

Source of the Cocaine

In this statement, Tejada dramatically described his travels to the United States and his alleged relationship with the female informant. What he did not include was any explanation as to the source of the drugs. On the third page of this statement, Tejada cryptically mentioned that he asked Mejia if Mejia knew anyone who had access to drugs. According to Tejada, a few days later, Mejia called him and told him to meet Mejia at a restaurant. Tejada claimed that Mejia told him to leave the car unlocked, and that by the time he and Mejia exited the restaurant, a suitcase had been placed in the back seat of his car. There was no mention of how the suitcase got in the car, who placed it there, or whether the suitcase contained the cocaine at that time. Then, during his interview, Tejada claimed that Mejia gave him

the drugs and that the first time he ever saw the suitcase was on December 18, 2006.

These statements contradict the information received by TFA Michael Naylor. The female informant had told TFA Naylor prior to the first recorded call that Tejada used suitcases to transport narcotics. Additionally, when describing the events of December 18, 2006, the female informant said that she met Tejada and followed him to Essex Street in Lawrence, MA. Once at a house on Essex Street, Tejada entered a residence with the suitcase. Tejada and Mejia then exited the residence with the suitcase and Tejada placed the suitcase in the female informant's car. TFA Naylor asked the female informant to find out what the street number of the Essex Street address was. The female informant later told him 430.[3]

At the safety-valve debrief, Tejada also told TFA Naylor that he worked at an automotive shop, but that no one at the shop was involved with drugs. This statement contradicts the information TFA Naylor received from a DEA taskforce agent in Massachusetts. The Massachusetts agent had received information that drug dealing occurred out of the garage. The Massachusetts

[3] In his pretrial services interview, Tejada claimed to live at 430 Essex Street with Elsa Batista for 3 weeks prior to his arrest. Mejia claimed in his pretrial interview to have been dating Elsa Batista of 430 Essex Street for the year prior to his arrest.

agent had also received information regarding the drug dealing of individuals named "Enoc" and "Flaco."

Entrapment

At the safety-valve debrief, Tejada told TFA Naylor that he was directed to call the male informant by the female informant. Tejada claimed that she told him what to say. When asked how he was able to quote prices to the male informant, Tejada claimed that the female informant held up her fingers and made a signal of 4 and then 5. When TFA Naylor asked Tejada how the female informant could hear what was being said, Tejada said that they were in bed during the December 11, 2006 call.

The transcript of December 11, 2006 call contradicts Tejada's account. Tejada was actively involved in arriving at a price of $20,500 per kilogram and given the music and background noise, it was improbable that they were in bed at the time of the call.

When TFA Naylor asked Tejada why he told the male informant that he would get him two more kilograms, Tejada said that the female informant told him what to say while they were at McDonald's. TFA Naylor asked Tejada how this was possible given that the telephone call occurred after the defendants and the female informant were on their way to Providence in separate cars. Tejada then changed his story and said that the female informant told him to say this before they left Lawrence, MA.

Untruthfulness

In general, Tejada's truthfulness is in question. He used an alias; he lied about his identity; he provided the government agents at the safety-valve debrief with different addresses from those provided to pretrial services or the address provided on the night of his arrest; and, he stated to the Court in his version of events that he arrived in the United States in 2004, when an "Enoc Soto" of Lawrence, MA filed taxes for 2003 and 2004. Given these instances of deceit and the above-described safety-valve interview, the Court should conclude that the defendant does not qualify for the safety-valve.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj.gov

**CERTIFICATE OF SERVICE**

On May 6, 2007, I caused the within "Government's Sentencing Memorandum" to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Thomas G. Briody, Esquire
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj.gov